American National Bank of St. Paul v. Commissioner.
American Natl. Bank of St. Paul v. Commissioner
Docket No. 109204.
United States Tax Court
1942 Tax Ct. Memo LEXIS 43; 1 T.C.M. (CCH) 240; T.C.M. (RIA) 42661; December 14, 1942
*43 Recoveries in 1939 of debts charged off in prior years held not taxable to the extent shown by petitioner that no tax benefit was received in such prior years. Held, petitioner did not sustain its burden of proof as to worthlessness of certain debts within the taxable year under section 23 (k) (1) of the Revenue Act of 1938, as amended by section 124 (a) of the Revenue Act of 1942. Paul G. Bremer, Esq., 209 Bremer Arcade Bldg., Minneapolis, Minn., and Samuel Lipschultz, Esq., for the petitioner. U.S. Hiken, Esq., for the respondent. VAN FOSSAN The respondent determined a deficiency against petitioner in income tax for the year 1939 in the amount of $11,138.28. The first issue is whether petitioner realized taxable income on the recovery in 1939 of debts deducted in prior years. The second issue concerns the propriety of bad debt deductions taken by petitioner for the year 1939. Findings of Fact Petitioner is a national bank with offices in St. Paul, Minnesota. It filed its original income tax return for the calendar year 1939 with the Collector of Internal Revenue for the District of Minnesota. Petitioner's original return showed a net loss of $4,050.36. In its original return *44 petitioner did not include profit on the sale of Federal Land Bank bonds and on a schedule attached to the return claimed an exemption from tax on account thereof. Respondent in his notice of deficiency added $53,254.38 to petitioner's gross income, as profit on the sale of Federal Land Bank bonds and $18,300.73 as recoveries on debts charged off and deducted in prior years, thereby making petitioner's net income $67,504.75. Petitioner does not challenge the item of $53,254.38. During 1939 the recoveries of debts charged off in prior years were as follows: Amount by which
deductions and
credits exceeded
Amount of
Year
gross income in
bad debts
Recoveries
deducted
year charged off
deducted
in 1939
1926
$ 54,949.86
$53,481.12
$ 250.00
1930
13,788.28
34,771.42
25.00
1931
154,466.40
91,507.50
13,257.04
1932
86,534.17
52,630.34
2,073.68
1934
71,276.53
11,002.73
2,006.26
1936
160,012.96
56,446.08
675.00
1937
416,343.53
13,884.62
13.72
After receipt of the revenue agent's report, proposing to include the additional amount in petitioner's gross income for 1939, petitioner on April 19, 1941, filed an amended return for 1939 with the same *45 collector. On its amended return petitioner deducted from gross income "writedowns" of bonds in the amount of $27,837.39, of which amount $3,024.89 represented premiums paid on the acquisition of the bonds. No deduction for these write-downs was taken on the original return because petitioner "didn't need them at that time." The amount of $27,837.39 was writtendown by petitioner pursuant to an order of the National Bank Examiner in its report of August 25, 1939. This report placed the amount of $27,837.39 in classification IV which was described as: Book assets, or portions thereof, regarded by the examiner as uncollectible or worthless and as estimated losses. Amounts so classified should be promptly charged off in order that the bank's books and statements may more properly reflect the bank's condition. The write-downs in question deducted by petitioner on its amended return were less than the amount ordered by the bank examiner. This difference was due to changes in the market value of bonds charged off between the time of the bank examiner's report and the date of entries relative to the write-downs were made on petitioner's books. Invariably when write-downs of bonds were made, *46 the market value of the bonds at the time of the write-down was used as a basis. The premiums paid by petitioner on acquisition of the bonds were written-down in exactly the amounts recommended by the bank examiner with one exception, namely, the amount written-down on City of Winnipeg bonds was $1.00 less than the amount ordered. The write-downs were authorized by petitioner's board of directors on December 26, 1939, and were published in petitioner's annual report to its stockholders dated December 31, 1939. Interest had been paid on all bonds which were written down and which were deducted from gross income on the amended return for 1939. From 1926 through 1937 petitioner made write-downs of bonds on its books but did not claim bad debt deductions therefor on its income tax returns. Petitioner, in recording these write-downs on its books, credited its bond account with the amounts of the write-downs and debited its undivided profits accounts with the same amounts. On the sale of written-down bonds for an amount greater than the amount to which the bonds had been written down, petitioner debited its bond account with the amount of the write-downs and credited its undivided profits *47 account with the same amount. It computed its gain therefrom the basis of the original cost and as though the write-down had never occurred. This practice was continued in 1940 and 1941. Petitioner extended a line of credit of $100,000 to The Nortz Lumber Company in 1930. Three years later petitioner loaned the same company an additional $50,000. The Reconstruction Finance Corporation participated in the latter loan to the extent of $40,000 on the understanding that such amount would be paid off before the amount owing to petitioner was paid. In 1935 or 1936 one of the Nortz brothers, the principal stockholders in the Nortz Lumber Company, died. Petitioner, as assignee, received the proceeds of a life insurance policy on the decedent's life. This receipt reduced the debt to approximately $74,000 or $75,000. As of November 1937 the total Nortz loan amounted to $83,227, of which approximately $14,612 was guaranteed by the Reconstruction Finance Corporation. At the end of November 1938 this loan had been reduced to $87,757, of which $11,887 was guaranteed by the Reconstruction Finance Corporation. On November 30, 1939, the loan had been reduced to $74,605, of which $7,596 was guaranteed *48 by the Reconstruction Finance Corporation. These figures do not take into account amounts less than a dollar. Between 1936 and 1939 the only payments made to petitioner on the loan, excluding payments made on the Reconstruction Finance Corporation participating loan, were credits amounting to one-third of the 6 per cent interest paid on the loan. In 1936 petitioner made a partial charge-off on its books of the Nortz Lumber Company in the amount of $38,500, which was not claimed as a deduction on its 1936 or on its original 1939 Federal income tax returns. The National Bank examiner, in a report of March 10, 1939, recommended that the Nortz Lumber Company loan be written down by the amount of $28,220.80. This recommendation was made in the following language: Nortz Lumber Co. - Unclassified portion represents unpaid balance of industrial loan which is being reduced. Company is in poor shape and making little if any progress. Bank holds junior lien on sundry lumber yards in addition to various receivable of uncertain value and assignment of $50,000.00 life insurance having approximately $4,000.00 cash value. It is doubtful if any reduction will be made until industrial loan *49 has been liquidated or until first lien on security held is paid. Under the circumstances considering the fact that concern is making such negligible progress, loan may be considered subject to question. Write-off recommended. The National Bank Examiner's report placed this loan in class 11, which was defined on the report as follows: Loans or portions thereof which appear to involve a substantial and unreasonable degree of risk to the bank by reason of an unfavorable record or other unsatisfactory characteristics noted in the examiner's comments. There exists in such loans the possibility of future loss to the bank unless they receive the careful and continued attention of the bank's management. No loan is so classified if ultimate repayment seems reasonably assured in view of the sound net worth of the maker or endorser, his earning capacity and character, or the protection of collateral or other security of sound intrinsic value. In his comments on matters requiring attention, the National Bank Examiner made this statement: CLASSIFIED LOANS All appears to be receiving proper attention. Consideration should be given, however, to a write-down on the Nortz Lumber Co. loan *50 if improvement is not forthcoming. On June 29, 1939, the board of directors of petitioner, by appropriate action directed that the Nortz Lumber Company loan be written down by $28,220.80. This write-down was entered on petitioner's general ledger on June 30, 1939, as a debit to undivided profits. As of November 30, 1939, the Nortz Lumber Company loan, including the participating interest of the Reconstruction Finance Corporation, was secured by a first mortgage of $68,500 on the North Dakota yards owned by the Nortz Lumber Company, a second mortgage of $10,000 on the Minnesota yards owned by the Nortz Lumber Company, and two notes receivable of $13,861.29. This property also served as security for petitioner's interest in the Nortz Lumber Company loan in the event it was not used in payment of the participating interest of the Reconstruction Finance Corporation in such loan. In addition petitioner held two $25,000 life insurance policies on the lives of E. H. and W. M. Nortz which had a cash surrender value at that time of $7,156.62. The Nortz Lumber Company made current interest payments on the loan through 1939. In its amended income tax return for 1939 petitioner claimed a *51 partial bad debt deduction in the amount of $46,720.80 on the Nortz Lumber Company loan. Opinion VAN FOSSAN, Judge: The first question is whether recoveries in 1939 of bad debts deducted in previous years were taxable income to petitioner in 1939. Under a long line of cases by the Board of Tax Appeals, petitioner is taxable on these recoveries only if it received a tax benefit in prior years as a result of bad debt deductions. In , the Board explained the tax-benefit theory as follows: The "tax benefit" theory, upon which petitioners rely, may be simply stated. Where a taxpayer takes a deduction in one year but because of other deductions has no taxable income for that year without reference to the deduction in question, a later refund of all or a part of the amount deducted will not be treated as income. * * * Where, however, a taxpayer by virtue of a deduction paid less tax than would have been paid if the deduction were not taken, a subsequent refund to the taxpayer of the deducted item is includible in gross income to the extent that taxable income of the prior year was offset by the deduction. Here the bad *52 debts recovered during the taxable year were deducted in the prior years 1926, 1930, 1931, 1932, 1934, 1936 and 1937. In all of those prior years except 1930 petitioner had no taxable income even disregarding the bad debt deductions taken in those years. Thus with the exception of 1930, petitioner received no tax benefit and is not taxable on any part of recoveries of debts deducted in all prior years. In 1930 the bad debt deduction was greater than the net loss so that to some extent petitioner received a tax benefit as a result of that deduction. Petitioner has failed to show the extent of recoupment prior to the year in question of the debts for which that deduction was taken so that we are unable to ascertain whether or not it received a tax benefit on the amount recovered in the year in question. Since this was petitioner's burden we sustain respondent's determination as to the year 1930. The next issue concerns petitioner's right to bad debt deductions claimed on its amended return for the year 1939. Petitioner contends that it is entitled to the bad debt deductions because it fulfilled the requirements of section 23 (k) (1) of the Revenue Act of 1938 and the relevant regulations *53 pertaining thereto. Respondent disagrees with petitioner that these requirements have been fulfilled. At the time of the hearing the statute governing this case was section 23 (k) (1) of the Revenue Act of 1938 and the parties at that time properly relied on that section both at the hearing and on brief. That section required that the taxpayer ascertain worthlessness and charge off debts before it could be entitled to a bad debt deduction. However, since the hearing and filing of briefs, section 124 (a) of the Revenue Act of 1942, approved on October 21, 1942, amended section 23 (k) (1) of the Revenue Act of 1938 to provide that a taxpayer is entitled to a bad debt deduction if the debt became worthless during the tax year. Although the necessity for proving ascertainment and charge-off has been eliminated by the 1942 amendment, there remains the necessity for proof of worthlessness. The only evidence submitted by petitioner as to worthlessness of the bonds written down was an order from a bank examiner that the bonds be written down. This order in and of itself is not sufficient to sustain petitioner's burden of proving worthlessness. Rather it is to be weighed along with other *54 evidence. See . Here there is nothing in the record to show that the bonds were in default or that they would not have been paid on maturity. On the contrary, the record shows that interest payments were made currently on all of the bonds written down. Moreover, there was a sharp improvement in the market price as to most of the bonds between the date of the examiner's report and the actual writedown. We hold that petitioner has not sustained its burden of proving that the bonds became worthless to the extent claimed in 1939. The bond premiums paid on the purchase of the bonds are not deductible as bad debts because bond premiums are not debts. Neither are the premiums in question deductible in the present case as losses, as is indicated in , wherein the Supreme Court said: * * * Unless the addition [to a fund set up to amortize bond premiums] amounted to a loss "actually sustained within the year" no deduction could be made therefor. Obviously, no actual ascertainable loss had occurred. All of the securities might *55 have been sold thereafter above cost. The result of the venture could not be known until they were either sold or paid off. Accordingly we hold the bond premiums paid on the bonds written down by petitioner are not deductible. As to the Nortz Lumber Company loan written down by petitioner, it is to be noted that there was no order by the bank examiner. He catalogued this loan in class II and suggested that "consideration should be given, however, to a writedown on the Nortz Lumber Company loan if improvement was not forthcoming". Petitioner introduced some evidence to show the poor financial condition of the company in 1939. The record indicates, however, that as of November 30, 1939, this loan, which at that time totalled $74,605, was secured by a first mortgage of $68,500 on the debtor's North Dakota yards, a second mortgage of $10,000 on the debtor's Minnesota yards, two notes receivable of $13,861.29 and two life insurance policies for $25,000 each having a cash surrender value of $7,156.62 on which the debtor paid the premiums at all times. Petitioner has made no effort to show that this security was worth less than its face amount. The current interest on the North loan was *56 paid by the debtor. In view of these facts we hold that petitioner has failed to sustain its burden of proof as to the worthlessness of the Nortz Lumber Company loan to the extent written down and is not entitled to a bad debt deduction therefor during the taxable year before us. Under the system of bookkeeping used by the petitioner, respondent argues that in point of fact no charge-offs occurred. In view of our conclusion it is unnecessary to consider this argument. Decision will be entered under Rule 50.